Thank you, Your Honor. Catherine Young from the Federal Public Defender's Office for the defendant Jeff McGrue. Mr. McGrue raises various challenges to his conviction and sentence. And the one I want to turn to first, unless there's anything else the Court wants to look at, is the question of whether Mr. You know what you have to do for me? Talk slower, enunciate distinctly. Thank you, Your Honor. Thanks for letting me know. I apologize. Young people today really like to talk very, very fast. I know. It's nerves. They text fast. I really apologize. No, that's okay. Thanks for letting me know. No, that's all right. No, no. Go ahead. So, Miss, I'd first like to turn to Mr. McGrue's challenge to the Section 514 convictions. Section 514 requires passing a false or fictitious instrument, document, or item purporting to be an actual security or other financial instrument issued under the authority of the United States. The statute, the legislative history of the statute, as indicated by this Court in Howick, indicates that it's intended to fill a gap in the anti-counterfeiting statute, which prohibits duplication of actual Federal obligations. And the legislative history states the bill makes it a violation of Federal law to pass any items purporting to be negotiable instruments of the United States. And it's our contention that the bonded promissory note, or the BPN, which Mr. McGrue passed never intended to be anything more than an individual obligation. And that's clear. Of whom? I'm sorry, Your Honor? Of whom? Whose individual obligation do you think it was? Henry Paulson's? No, Mr. McGrue's individual obligation. Mr. McGrue's name appears four times in the BPN. It says, I, Jeff McGrue, as maker by this BPN, do tender this offer of payment. Then the BPN states that the obligees are going to charge the homeowner's mortgage via pass-through account Jeff McGrue. In other words, they're going to charge his individual account. Then the BPN states, I, Jeff McGrue, as principal for this BPN, unconditionally promise to pay or cause to repay the sum of the BPN. And then the BPN is signed by Jeff McGrue as real party in interest, as authorized agent for the homeowner. He says it's his individual obligation. He's the maker. It's to be paid through his individual account. He's the principal. He promises to pay the amount. And it's signed by him not as any authorized agent for the government, but as an authorized agent for the individual homeowner. So what is the – Go ahead, Jeff. Sorry. Yeah, please. So why do we need the name Henry M. Paulson, Jr.? Well, that's because – I mean, is that just there for show or what? I mean – It's there because that's the person who is going to pay the account from Mr. McGrue's individual account in the treasury. Because Secretary of the Treasury. Yeah. Mr. McGrue testified that this individual – the name is there because he's the one that we have to make sure we fulfill the obligations to fill all the documents. And as an obligee, what did that mean? You know, he said – I have to find it. I wrote it down. He said that the reason that Paulson is an obligee is because they have to submit the right documents to Paulson to get the loan paid through the BPN, through his individual account. I'm sorry. And I wrote it down on the site where he explains it, and I can't find it right now. But he explained that the reason Paulson's name – he says it doesn't obligate Paulson to do anything. It's there because they have to submit the proper documents to get Paulson to pay the lender from McGrue's individual account. And that's how McGrue explained why that name is there. But I think the BPN over and over says that it's McGrue's individual obligation. So let me understand your argument. Your argument here is not that the BPN isn't a fraudulent document, but rather that it doesn't purport to be an obligation of the United States government. That's my obligation in these challenges to the 514 counts. Yes, Your Honor. Right. You're not arguing that it represents any real debts or any real ability to pay the mortgages. You're just arguing that it doesn't purport to be an obligation of the United States government. That's exactly correct, Your Honor. In these 514 counts, the document cannot violate the statute unless it purports to be an actual United States government security or instrument. And we're claiming this BPN, if you look at its exhibit, it's ER-292. It clearly bears no indicia of a federal or U.S. government obligation. Well, there are some indicia. We know the term obligee means that somebody has a duty. I'm not sure how Mr. McGrue can impose a duty on Mr. Paulson. But my question is, is this a factual question or a legal question? Well, I think it's both. Is the question whether a reasonable person might view this as representing an obligation of the government, which I suspect the victims did, or is it whether or not we can legally interpret it to be an obligation of the government? Well, I think it's both, Your Honor. In this case, we're claiming that the jury was improperly instructed. I mean, there's various arguments as to why this conviction, why he was convicted, notwithstanding the fact that we claim it's not official obligation. So it's both. But as I understand it right now, you're making an insufficiency of the evidence argument. So my question is, is the question whether a reasonable person might view this as being represented as an obligation of the government, or are you just arguing that if we parse it carefully as judges, we can determine that it really wasn't? Well, no, Your Honor. I think you mentioned an insufficiency argument, and there's various arguments under here, including a jury instruction argument. I think that it's a question of both law and fact. The jury has to be properly instructed and then make the factual findings based upon the instructions. We're talking past each other here, so let me focus you on your – you're saying that there is not evidence here from which a reasonable jury could conclude that Mr. McGrew represented this to be an obligation of the government. And my question is, is that a question of fact? In other words, could – do we look at this and say, well, a reasonable juror could think it was the obligation of the government, or is it us being lawyers and parsing it and saying, well, we know it's not? Which are the two? Well – It can only be one of the two. Pick one. Well, I think if you look at it as a lawyer, there's – I don't think there's any way you can construe this to be – I think as a legal matter, it cannot be construed as an – under the statute as qualifying. Okay. But I did want to point, because Your Honor also referred to the term obligee. And that's one of the issues that was addressed in our brief, that an obligee is not someone who is obliged to perform. It's someone to whom an obligation is owing. In other words, a duty of performance is due to the obligee. It's the obligor who has the duty of performance. It's the obligee to whom the performance is due. And that's set forth in our brief. And so I want to continue unless there are any further questions on this issue. The reason that we claim – and I also did want to reserve some of my time at the end. We claim that the reason that the jury was able to find or did find that there was – that this was a fictitious government obligation was because the government introduced testimony from an expert who, by misrepresenting the term of an alert that the expert looked at the items of, by the jury instructions that omitted the key term, and also that in closing argument the government omitted the key terms which would require the jury to find that this instrument was actually issued under the authority of the United States. Unless there are any further questions on that particular issue, I'll move to some of the sentencing issues. One of the sentencing issues that we raise in our brief is the issue of intended loss. Because intended loss was based upon the face amount of the BPNs, even though the government admitted pre-trial that the amount of the BPNs was twice the amount of the loans that were at issue. So clearly, intended loss that was imposed upon Ms. McGrew was twice the amount of the actual intended loss, even by the government's own theory. We also challenge the enhancement for the number of victims. Because if we claim that the amount of loss through the BPNs was the amount of loss, then the victims would not have been, would not have lost anything because they would have had the property back. So we argue that there's not a consistent theory of who was victimized and what the amount of loss was, and that inconsistency is against the theories of the guidelines. We also challenge the fact that an enhancement was imposed because a substantial part of the fraudulent scheme was committed from outside the United States. And in this case, it was clear that almost the entirety of the scheme was committed inside the United States. The enhancement for committing a scheme outside the United States applies where a substantial part of the fraudulent scheme was actually committed. It's intended to address financial transactions that are moved outside the United States to conceal illicit profits. And because those types of transactions require a high level of sophistication and complexity, they're very difficult to detect and require diplomatic processes used to secure testimony. The enhancement is specifically addressed telemarketing and other fraudulent schemes that have relocated to other jurisdictions once they know or suspect that authorities have discovered the scheme. In this case, every aspect of the BPM occurred in the United States. The consultants, the homeowners, the lenders, the recruiting, the seminars, the meetings, the documentation, the mailing, and the filing all happened in the United States. And when anything went wrong... What happened in Panama? Mr. McGrew was in Panama. He was in Panama. He would come back to the United States whenever there was something that needed to be done. If there was filings that needed to be done, he would come back here. If there were mail that had accumulated, he would come back here. He was in Panama because that was where he generally resided. But when something needed to be done... Wasn't there evidence in this case that he was implementing the scheme from Panama and directing others from Panama? There was unquantified evidence that there were some e-mails back and forth, that he would talk to people as problems arose. But the enhancement requires that a substantial part of the scheme be committed outside the United States, and there wasn't evidence we're contending to support that element. And in fact, it was objected to, which means the government was required to prove a substantial part of the scheme. In the government's authority, 90 percent of the scheme took place outside the United States. Here, we know that almost everything took place inside the United States. Whenever anything had to be done, McGrew would come back here. There were some telephone calls, some e-mails, but we don't know how much of the scheme they involved. And therefore, the government hasn't met its burden of proving that a substantial part of the scheme occurred. What would prompt him to come back to the United States? Someone would call him and say, I don't know. For example, McGrew, Morgan and Gidrick were the ones who were handling what was going on inside the United States. And they would call him and say, I don't know what to do. You have to come back here. You know, I'm going to quit unless you come back here because I don't know what to do with this particular case. And there's no suggestion in the record that he, or at the sentencing hearing, that he sort of directed them what to do or how to do it? There were. He had to come back and actually do it himself? If they didn't know what to do, then he had to come back. On the day-to-day operations, they knew what they were doing. And they operated the scheme without him. There is evidence, but it's unquantified. We don't know what was said, that there were e-mails, that there were maybe Skype communications. But we don't know what was said in those e-mails. There aren't quantified. And therefore, it's our position that the government hasn't met its burden of showing a substantial part of the scheme was committed from outside the United States. Clearly, there was something. There was something. But he came back over and over again. When there was a meeting, he came back for it. When there were filings, like there were some UCC filings. What was he doing down in Panama? He lived there in Panama? Was that his home? He lived in Panama. He had gone down there some period of time before, and he liked the ambiance. He liked it. He had a prior conviction, right, related to, or a prior? He had no prior. Didn't he have some sort of, wasn't he involved in some prior mortgage? He had no prior convictions. One of the arguments in the papers is that there was a prior notarial protest program that he had operated in Washington that was improperly introduced and was prejudicial. It should not have been introduced because it was completely different from this program. But there was a civil action. Was he a native of Panama? No. He was a native. I'm not sure. I think maybe Seattle. Seattle, I think, was where he came from.  And he just decided to relocate to Panama. It just, yes, at some point, I think in the early 2000s, I'm not sure exactly when, he went down there and he liked it. So he decided to relocate. Yes, Your Honor. He was exploiting minority homeowners? He, Mr. McGrew, in fact, was not involved in the day-to-day operations. But Morgan and Guidry, one of them had an, they were recruiting real estate agents to involve their clients in the process. And one of the real estate agents, I think, had a minority clientele. So I think there was an aspect of this that it wasn't directed at minorities. But I think one of the real estate agents had a minority clientele. And so there were, in that sense, some minorities involved. Well, those folks are the most vulnerable. That's why we got this crisis, because the banks gave them a lot of money. They really didn't need to refinance the house, of the value of the house. And people were just taking advantage of them. And that's what he was doing. Well, I disagree respectfully, Your Honor. I think even as late as sentencing, the judge was saying, these are honestly held beliefs. These are honestly what? Honestly held beliefs, that even as late as sentencing, after being convicted, the judge just still said, these are honestly held beliefs. He had a psychiatric evaluation by the BOP. They said he had rigid and dogmatic beliefs. He believed in the program. So it's hard to apply the concept of intended loss to a program like this, where he honestly believed in what he was doing. So he believed he could direct the Treasury Department to take those purported bonded promissory notes to then pay off encumbrances. Yes, Your Honor. He spent like 16 hours a day on the Internet researching, he said. And there's a redemption theory, and there is a movement behind it. And they believe in this type of thing, which I can't even begin to explain. But they do have the right to, under this theory, they believe that their birth certificate gives them the right to a certain amount of bonds at the Treasury. And that's part of their theory. Now, unless there are any further questions. He really believed all of that. He did. And that's what the judge said as late as sentencing, even after he'd been convicted. The judge said, these are honestly held beliefs. I would like, unless there are any further questions, I would like to reserve some time for rebuttal. Thank you. What is it? What sentence did the probation officer recommend? Oh, I'm sorry, Your Honor. May it please the Court. Stephen Gorovitch on behalf of the United States. As I recall, as I understand the Court's question, it was what did the probation officer recommend. Is that correct? Yeah. I don't recall. It was a below-guideline sentence. The government recommended 20 years. The judge imposed 25 years, which was a below-guideline sentence. Yeah, but wasn't the government's recommendation the same as the probation officer's in this case? Yes, Your Honor. My memory has now been refreshed by my co-counsel. Okay. So focus, if you will, on the sentencing part of this case. Why was the judge justified in going substantially above what both the probation officer and the government recommended? I'd be happy to address that. I had assumed that would be the Court's main questioning in this case. First of all, Your Honor, I think the fact that the judge went above the government's recommendation illustrates that the judge was making up his own mind. He was not blindly going with what a prosecutor recommended in this case. The reason the judge was justified, and the reason this is a reasonable sentence, is first, for several reasons. First is specific deterrence. And that's a legal term that we use. But let's take a step back from the law. What that really means is the judge, the district judge in this case, was confronted with someone who had done this repeatedly and basically indicated and showed the judge that he would do it again. This defendant did this once before, as I believe Judge Bregerson or Judge Paez noted, in 2003 in Washington. A judge told him, essentially through a judicial opinion, that that was not permissible and that it would not work. Then this defendant came to California and he started up the scheme that was charged in the indictment. It failed. Then the defendant was about to go to Panama when he was arrested. And co-schemer Gerald Guidry testified that the defendant said, we'll just do it again once I get back from Panama. Then the defendant was charged in this case. And while he was out on bond awaiting trial, he did it yet again. That is why Judge Wright remanded him. And then at his alibi, he was in custody. And he's in prison now, isn't he? He is in custody, Your Honor. Is he in prison? He is at the United States Penitentiary. Okay. So he's in prison. He is in prison, Your Honor.  And then he's probably doing the same thing there. Hopefully not, Your Honor. With the prison guards and all the rest of them. That's what they do. Yes, Your Honor. I'm speaking from some of the cases I've had in the past. They can't help it. Your Honor. It's a mental illness. I would simply say that the evidence is clear that he was going to do it again. And I have only been a prosecutor for seven years. But in my seven years, I have never seen a defendant stand up at the allocution and basically tell the judge that he would do it again. And I know the standard for this Court is not what this Court would do, but was the district judge reasonable? But if the three of you were district judges, what is someone to do with a defendant who has victimized the most vulnerable members of our society? You'll note from the sentencing transcript, excerpts of record 32 to 33, Judge Wright even contemplated that perhaps the vulnerable victims enhancement would apply. You have someone who is vulnerable, who is taking advantage of the most vulnerable victims of our society during one of the greatest mortgage crises that has ever affected this country, and has basically made it clear he will keep doing this. We can use terms like specific deterrence, but at the end of the day, the district judge in this case felt better. Well, a specific deterrence is a lock them up for the rest of his life. Your Honor, the defendant's age is such that a 25-year sentence may ultimately be the end of his life. He was, what, 51, 52 at the time? He was 51, I believe, when he went into custody, Your Honor. So he got, what, a 25-year sentence? He did get a 25-year sentence. Unless the Court has – oh. What I'd also like to point out as well is, first of all, specific deterrence is one of the factors. Was there a psychiatric report? Yes, Your Honor. At one point during the trial or the pretrial proceedings, the judge became concerned that the defendant may have competency issues. And as this Court has instructed district courts, they are to, if there are red flags, they are to follow up on them. The government actually did not feel it was necessary, and Judge Wright overruled the government and said, no, we're going to order an evaluation. And so, yes, that evaluation was done, and the defendant was competent and sane. Well, I mean, he's competent if he can sit with his lawyer, understand what's going on, and it doesn't take much to be competent, does it? It is admittedly a low standard, Your Honor. Yeah. Okay. But in addition to – and I think this goes to Judge Hurwitz's question at the beginning. In addition to the specific deterrence, the district judge also focused on the harm to the victims. The district judge calculated the guidelines, but the district judge imposed a below-guidelines sentence. I think, you know, the guidelines are advisory. The judge made his own determination. And if the Court will read the sentencing transcript, the district judge said repeatedly, I sat through this trial, I heard the grave harm that this defendant has inflicted upon the most vulnerable members of our society. These were people who were on the verge of losing their homes, and this is the equivalent of, rather than the defendant helping them stay in their homes, it's the equivalent of giving a drowning man a block of concretes. The other – the district judge, and the record is clear, considered all the other factors that the appellant had raised. How many bankers have we put in prison for 25 years? I don't know the answer to that, Your Honor. I don't know the answer to that. You're doing the same thing, or worse. I'm not – I'm just talking. Sorry, Your Honor. I'm a little – The losses are overstated. Well, Your Honor, the loss was calculated based on the face value of the bond of promissory notes. And the reason that I disagree with the appellant's argument that that was not the proper amount is that was not the amount of the mortgages, but that was the amount that Mr. McGrew intended the Treasury Department to pay out. And the record is a little bit unclear on this, but if you overpay an obligation, usually part of it is refunded. And who is it refunded to? The defendant owned all of these houses, because as part of the scheme, he tricked the homeowners into signing over their houses to him. So he owned these 300 houses, and that was actually part of the fraud in this case. What he did was he executed fraudulent full reconveyance documents to make it appear that title was clear, to make it appear as though the mortgages had been paid off. He filed these documents with the county court. Well, that's what the banks did. Remember, they had assembly lines going out, requests for full reconveyance and all that. I – They had law lawyers doing it, too. But the defendant forged the documents in this case by signing as an authorized agent of lenders, even though he was not authorized. He – Well, I understand that, but I'm not sure it answers Judge Perez's question. Why was the loss – if the victims are the homeowners, why isn't it just that their equity was the loss? The government never paid out any money, so it didn't have any loss. Why isn't the appropriate amount of loss for restitution purposes measured by the difference between the value of the house and the mortgage? Your Honor, I'd like to answer that in two ways. First, I'd like to disagree with – respectfully, of course, disagree with a factual statement the Court made that the government would never pay that out. That assumes that the clerks who process things do everything correctly. We're all aware of instances where somebody – Well, is there any evidence that the government did pay it out in this case? No, Your Honor. There was no evidence. Okay. So the government didn't pay it – government didn't pay it out in this case. So why is the loss not simply the difference between the mortgage and the value of the house? The reason for that, Your Honor, is there's admittedly not a lot of law on Section 514. But as Appellant's counsel said, the reason Section 514 was enacted was to put a – to basically close a loop with Section 471. Title 18 U.S.C. 471 deals with counterfeit obligations of the United States. We look to the face value of the bonds. That is extremely clear in U.S. Sentencing Guideline Provision 2B5.1. But, look, I agree with the point Your Honor's making. This is not – it's not a guidelines case. Yes, we have to calculate the guidelines. The guidelines for the most analogous criminal code state that it's – that it's the face value of the counterfeit obligations. But the district judge – Why do we have to use the guidelines? The Supreme Court says they're unconstitutional. Well, the Supreme Court has also said we at least have to calculate them and consider them. The district judge did that. But the district judge didn't follow them in this case. He made it very clear that he was focusing on the things that I think Judge Fredersen you have suggested judges should focus on. That's the particulars of the case, the specifics of the defendant, the harm that is caused in the case. When did I say that? I was listening to some prior oral arguments. You know, I still don't quite understand how we get to the loss that the district court judge used to calculate the guideline sentence. Your Honor, I just took the face value and that was it. Yes, Your Honor. It was the intended loss. But these notes – somebody did try to present these notes, correct? Yes. These BPNs. The notes were all sent to the lenders, and the lenders started sending rejection notices back to the homeowners and sometimes the defendant directly. So the BPNs were actually presented to the banks. But they never resulted in any loss. I mean, the government never paid out anything. No, there was no actual loss related to the BPNs. Were they ever presented to a government official? There's no evidence in the record. A treasurer? And I would have to say we have no evidence of that. So the answer, to be fair to the defendant, has to be no. But, again, I agree with the point, Your Honor. So the whole thing is just based on intended loss. Yes, Your Honor. This was the – this is what – if everything had panned out, the government would have lost the value of this. Yes, Your Honor. But – Of all these notes. Yes. And I agree. Look, I agree, Your Honor, that the guidelines are the guidelines. We have to calculate them. But I agree with the point I think Your Honor is making, that it seems a bit high for an intended loss case. But this case was not about the guidelines. The district judge repeatedly said in the sentencing transcript, I don't care what the guidelines are, essentially. I sat through the trial. I heard about this defendant. I heard the victims. I understand the case. Well, look, if our case law says that you have to – there has to be a correct determination of the guidelines, because that might, as the judge thinks about what he's going to do with it, he or she's going to do with the case, look at the guidelines. And I don't think there's any reason to go down or go up as necessary to reach the individualized sentence that's required. Yes, Your Honor. And the reason the guidelines were calculated correctly is because the most analogous guideline provision is 2B5.1, and that specifically states that you take the face value of the counterfeit items. So it seems illogical that these two statutes, 471 and 514, which are essentially designed almost to cover the same thing. One is counterfeit real obligations. The other is fictitious obligations. It makes no sense under the guidelines to treat one differently than the other. If you're going to take the face value of the counterfeit obligations, you should also take the face value of the bond of promissory notes. But again, Your Honor, I agree with the Court. The guidelines have to be calculated, but the judge did not impose a sentence. The judge also added on, I guess it was two levels or whatever it was, for the defendants to take the face value of the bond of promissory notes. And, of course, the defendant was not satisfied with this. And the judge also added that it was part in a crime when he was in Panama. Yes, Your Honor. Of course, as the Court knows, it's the question is was that clear error, and this judge sat through the trial and heard testimony from Gerald Guidry and Ron Morgan, who basically testified that they were working on this scheme with the defendant and he was talking to them and giving them direction from Panama. Is that what they testified to at trial? I believe that is, Your Honor. Were you at the trial? Yes, my counsel and I handled the trial. And they testified at trial that he gave them directions from Panama? I don't think it was that specific. As I recall from the trial, he said, we talked to the defendant about this when he was in Panama, about the scheme. So I'm not going to say direction because that term, especially since there's a leader-organizer enhancement issue, has a different meaning. But it was clear, at least to me from the record, and I would ask the Court to focus on the testimony of Ron Morgan and Gerald Guidry, that the defendant was in Panama talking to them about the scheme. But the question is, is it clear error for the district judge to reach that conclusion having heard that testimony? So counsel, start out with the question about the bonded promissory notes under 514. Yes, Your Honor. Whether they, as a matter of law, they even qualify as an instrument that would fall under 514. Yes. I'd like to direct Your Honor's attention not to the bonded promissory note itself, but to the letter of instruction. And we introduced a variety of these exhibits. But the one I'm looking at happens to be Exhibit 148, which is in the government's excerpts of record, page 828. And if you'll notice that the first paragraph says, Enclosed, please find the bonded promissory note, that processing of which will set off the entire current amount stated on the claim. And here is the important language. The negotiable instrument is presented in the authority of Public Law 73-10 UCC 3-104C. And then it cites a Supreme Court case as well as Witkin's. That's the first reason why the defendant in his own documents is saying essentially this is issued under the authority of law. I think as Judge Hurwitz noted, Henry Paulson's name is all over this document. Moreover, I think it's important to understand the context of the document in addition to the language in the bonded promissory note itself. And just I'm turning the page to 829. The whole purpose of this was the defendant was to send the bonded promissory note to the lender. The lender was then to present it to the Treasury Department, and the Treasury Department was supposed to pay it. By signing it and presenting it, the defendant is essentially saying I'm directing the Treasury Department to do that. It is not unreasonable for the jury to conclude that that is an instrument issued under authority of law. Your Honor, there's one factual misstatement in the reply brief that I want to address before I run out of time because I think it will resolve the search issue. In the reply brief, look, the – I think the court, the search incident to arrest the law is all in the brief, so I think it's pretty clear. The reason, though, this is also an inventory search is because contrary to the account's brief, the agents did not rummage through the defendant's bag and pull out papers and review the papers. I think that is repeatedly stated in the reply brief to try to argue that this was not a valid inventory search. There were no papers from the bag that were introduced at trial. It was just the I.D. cards. But what happened was, if the court will look at excerpts of record 1234 to 235, that's the inventory of the search. The agents arrested the defendant, went through his bag, pulled out his laptop computer, and then did what agents are told to do by this Court and district courts. They went and they got a search warrant for the computer, and those are the exhibits that were put into trial. If the facts were, as appellants reply brief represents, I would agree that's not an inventory search because agents are not allowed to go through bags and start reading papers as part of an inventory search. But that's a very important factual distinction that I wanted to make clear for the record. Okay. Does the Court have any other questions? No, we're fine. Thank you. Thank you for your time, Your Honor. Thank you. Thank you, Your Honor. I first wanted to respond to counsel's statement that there was an error in the reply. And based on what he said, it's consistent with what it was said in the reply. In fact, they took his bag and they did what they purported to be an inventory search, and that's how they found the card. That's separate from the computer, which they did take out of the bag. But they did go through and take the cards that we have argued were improperly emitted and improperly seized during that search. Except the cards, you say? Yes. He had some fake identification cards that were, we argue, were improperly introduced at trial. And they were seized when they were going through the bag, which we argue was an improper search. Isn't there an inevitable discovery issue there? Surely, since they arrested him, they were going to have to inventory his bag sooner or later and they would have found the cards, no? Well, we're arguing not, Your Honor, because we're arguing that the inventory search which they did was exceeded the scope of an inventory search and that it was actually pretextual, a search for incriminating evidence, because the only thing that they took and itemized were the things that they found that they alleged to be incriminating. So we're arguing that it was pretextual. I also wanted to respond to some of the issues raised with respect to the reasonableness of Mr. McGrew's sentence. And he is in his 50s. It's a 25-year sentence. But his life expectancy is probably not that of other people because he's 440 pounds. So he – it is an extremely onerous sentence for someone of his – with his health issues. Also, counsel said that he – that Mr. Guidry had testified that during his conversation with Mr. McGrew, he testified he would do it again. And the record does not reflect that. The record reflects that Mr. McGrew said it would be best to drop the clients and walk away. That's ER 775. Counsel also said that Mr. McGrew said he would do it again during sentencing. And I'm not sure that that's accurate. There was no cite to the record on that. So what happened while he was – while the trial was pending or while he was released? While the trial was pending, he was up in Washington and there was an allegation that he did some other, I think, mortgage reduction program up in Washington. And so his – his – That was brought to the attention of the pre-trial release? Yes. And his release was revoked and he was held in pre-trial custody. Then he was – he remained in custody throughout the trial? Yes, he did, Your Honor. But our argument is that even for purposes of deterrence, this is the first time – this was the first time. So let me – so if you were – you know, our case – I don't know if there's a case where we have found that a below-guideline sentence is unreasonable. No, I understand, Your Honor. It's very difficult to win on reasonableness, which was one of the reasons I also focused on the fact that the guidelines – We've said that – we've said that within guidelines – I mean, there were some – there were some special circumstances, but within guidelines, I think we've said in one or two instances was unreasonable. I understand, Your Honor. And so one of the arguments that we have raised is the guidelines were improperly calculated. But I think in this case, the government itself presented some cases in which a 300-month sentence had been upheld. And in all of those cases, you have frauds that went on for years. You have amounts that were actually lost of like 100 years. This was a blatant fraud. I mean, he signed his name to document. I mean, it just – it's just outright blatant. No, it's – What's the justification? I mean, you say he truly believed in this program. No, I understand. How can he sign the documents that would result in a full conveyance of the homeowner's property? I understand, Your Honor. And one of the – It's just outright – it's just fraud. One of the points that were made in our brief is that that was not part of the program. At the end, when the program was falling apart and none of the – none of the lenders had accepted the promissory notes, they were all being rejected, he had tried to file liens, which was part of the program. He really believed in the program. He tried to file liens. The liens were rejected. He said, how can I get some time in order to figure out what's going wrong? And so his testimony and the testimony of other people was that he said, I'm going to do this. I know it's wrong, but I'm going to do it because I need to buy time to get the banks to deal with me and to acknowledge the promissory notes. So that's why he did the – he thought that he had the authority to do that because with the bomb, the promissory notes, he had paid – He had an honest belief that he had the authority to sign – He thought he did, but that's not part of the program. It was only at the end of the program there was testimony that he was absolutely desperate to figure out why it wasn't working and what he could do to make it work. And I think I'm out of time now, so unless there's any further questions. So he needed some spending money, huh? Well, I don't want to say that that was his motivation, Your Honor. I think he – he believed in it and he wanted to help people. Thank you. Thank you.
judges: Pregerson, Paez, Hurwitz